UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| LYNNEA SANDEEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18–CV–248 |
| | ) | |
| THE PAUL REVERE LIFE INSURANCE | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

This matter is before the Court on cross-motions for judgment on the administrative record. [Doc. 119; Doc. 121]. Defendants Unum Group Corporation and The Paul Revere Life Insurance Company ("Defendants") denied Plaintiff Lynnea Sandeen's claim for long-term disability benefits. Plaintiff based her claim for long-term disability benefits on her medical conditions of (1) irritable bowel syndrome, (2) fibromyalgia, (3) carpal tunnel, and (4) memory loss. Defendants denied the claim after determining that Plaintiff's medical conditions did not support restrictions and limitations that prevented her from performing her "occupation" and sedentary work.

Before and during the pendency of her claim, Plaintiff saw numerous doctors and healthcare providers, and a number of Defendants' medical professionals and administrators reviewed Plaintiff's claim and medical records. The numerous medical visits and administrative reviews created a voluminous record, over 1,700 pages. The Court has thoroughly reviewed the entire administrative record.

After filing their motions for judgment, the Parties filed responses, [Doc. 132, 133], and replies, [Doc. 137, 138], and a separate motion regarding conflicts of interest, [Doc. 142]. These matters are now ripe for disposition. For the reasons stated below, Plaintiff's Motion to Determine

1

Extent of Deference Given to Unum's Decision, [Doc. 142], will be construed as a supplement to her Motion for Judgment, and her motion for judgment, [Doc. 121], is DENIED. Defendants' motion for judgment, [Doc. 119], is GRANTED.

## I. Standard of Review

This case arises from a determination of benefits under a plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. ERISA claims decisions are reviewed under a *de novo* or arbitrary and capricious standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). Generally, a court reviews a decision *de novo* unless the ERISA plan gives discretion to the plan administrator to determine benefits eligibility. *Id.* When the administrator is given this discretion, its decision is reviewed under an arbitrary and capricious standard. *Id.*

While the arbitrary and capricious "standard is the least demanding form of judicial review of administrative action," it is not a rubber stamp. *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (quoting *Williams v. International Paper Co.,* 227 F.3d 706, 712 (6th Cir. 2000)). A reviewing "[c]ourt must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* (quoting *Williams,* 227 F.3d at 712). One factor to be considered by the reviewing court is any conflict of interest created when an administrator decides benefits eligibility and pays the benefit. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). Additionally, the Court must review the "quantity and quality of the evidence in the record." *Gilchrest v. Unum Life Ins. Co. of Am.*, 255 F. App'x 38, 42 (6th Cir. 2007). Importantly, an administrator's decision is not arbitrary and capricious when it relies on "the medical opinion of one doctor over that of another" because

2

the administrator would have a reasoned explanation based on evidence for its decision. *McDonald*, 347 F.3d at 169.

## II.   Background

Plaintiff Lynnea Sandeen worked for Buerkle Motor Company Inc. as a "Finance & Insurance Manager." [Doc. 17-1, PageID 176, 242]. While working there, she participated in a long-term disability plan. The plan states:

> The employer is the plan administrator unless otherwise noted. The Paul Revere Life Insurance Company, as claims administrator, has the *full, final, binding and exclusive authority* to determine eligibility for benefits and to interpret the policy under the plan as may be necessary in order to make claims determinations. The decision of claims administrator shall not be overturned unless arbitrary and capricious or unless there is no rational basis for a decision.

[Doc. 45, Page ID 3091 (emphasis in original)]. Under the policy, the insured is "totally disabled" when he or she:

1. is unable to perform the important duties of his own occupation on a Full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy; and
2. does not work at all; and
3. is under Doctor's Care.

[*Id.* at PageID 3055]. The policy does not define "occupation."

While the policy does not define "occupation," the administrative record contains a job description for "Finance & Insurance Manager" from Buerkle Motor Company. [Doc. 17-1, PageID 242]. In this job, according to the position description, a Finance & Insurance Manager sold "vehicle buyers financing and insurance programs while closing business transactions generated by sales personnel and maintain[ed] minimum standards and store goals as determined by the finance director." [*Id.*]. The essential functions for a Finance & Insurance Manager are:

- Offer vehicle financing and insurance to customers and provide them with a thorough explanation of aftermarket products and extended warranties and a complete explanation of manufacturer and dealership service procedures and policies.

3

- Maintain knowledge of current sales and promotions, policies regarding payment and refunds, and security/privacy practices.

- Collaborate with sales teams to understand customer requirements, to promote the sale of company products, and to provide sales support.

- Greet customers and ascertain what each customer wants or needs.

- Interview applicants and request specified information for loan applications.

- Recommend, select, and help locate or obtain vehicle financing based on customer needs and desires.

- Prepare forms or agreements to complete sales.

- Compute sales prices, total purchases and receive and process cash or credit payment.

- Check funding agreements and CITs to ensure that they are complete and accurate, according to policies.

- Contact applicants, creditors or co-workers to resolve questions about applications or to assist with completion of paperwork.

- Understand and comply with federal, state and local regulations that affect the new and used[] vehicle and finance departments.

[*Id.* at PageID 242–43].

The position description provides physical demands. A Finance & Insurance Manager must "occasionally" stand, walk, reach above shoulder, squat or kneel, "constantly" sit, finger, and handle, and "frequently" reach outward and bend. [*Id.* at PageID 244]. A person in this position needed to "frequently" lift/carry 10 lbs or less, "occasionally" lift/carry 11–20 lbs. [*Id.*]. Also, a person in this position needed to be able to push/pull up to 25 lbs "occasionally." [*Id.*]. According to the job description, "occasionally" means "Occupation requires this activity up to 33% of the time (0–2.5+ hrs/day)," and "frequently" means "Occupation requires this activity from 33%–66% of the time (2.5–5.5+ hrs/day)." [*Id.*]. Last, "constantly" means "Occupation requires this activity more than 66% of the time (5.5+ hrs/day)." [*Id.*]. The job description describes the work setting as

4

"[a]n office environment in a controlled atmosphere building." [*Id.*]. Reasonable accommodations were available for this role. [*Id.* at PageID 242].

Defendants classified this job as a "sedentary" occupation although Plaintiff contends that her job should have been classified as "light." [Doc. 122, PageID 5297].

Plaintiff held this position until June 19, 2015. [Doc. 17-1, PageID 209]. She stopped working because she "was missing a lot of days and having to leave early often." [*Id.*]. She was having difficulties at this job because of her health ailments. [*Id.*]. Plaintiff filed for long-term disability after stopping work and was paid those benefits until November 10, 2017. [Doc. 17-2, PageID 1715–16].

Ultimately, she claimed that four ailments prevented her from working: (1) irritable bowel syndrome, (2) fibromyalgia, (3) carpal tunnel, and (4) memory loss. All of these conditions were treated by or opined on by Dr. Steven Vincent and Lindsey Locken, PA-C, Plaintiff's primary care providers. Specialists treated or evaluated the specific ailments. In an attempt to provide a coherent overview of the medical providers and ailments, the Court will first discuss Dr. Vincent and Lindsey Locken's general health opinions, and then review the specialists' opinions with each ailment, along with any specific information from Dr. Vincent and Ms. Locken regarding each ailment.

### a. Primary Care

#### 1. Dr. Steven Vincent

Dr. Vincent was Plaintiff's primary care physician for thirty-five years. [Doc. 17-2, PageID 1762]. He saw Plaintiff eight to twelve times per year. [*Id.*]. According to Dr. Vincent, Plaintiff suffered from "Fibromyalgia, Chronic Fatigue Syndrome, Joint Hyperrmob[il]ity, Costochondritis, Orthostatic Hypertension, Irritable Bowel Syndrome (IBS), Restless Leg

Syndrome, Degenerative disc disease with positive rheumatoid factor, Chronic Pain Syndrome, Depression, Anxiety and bi-lateral Carpal Tunnel Syndrome for which she had corrective surgery . . . . " [*Id.*]. Dr. Vincent explained that in February 2015, Plaintiff's illness "took a turn for the worse" and she was no longer able to work. [*Id.*]. He said Plaintiff "had developed IBS and would experience long bouts of diarrhea in addition to her fibromyalgia, chronic fatigue syndrome and chronic pain." [*Id.* at PageID 1762–63]. Along with worsening pain, she developed memory loss, had to lay down in the floor at work, and developed nerve pain, vertigo, anxiety, and depression. [*Id.*]. Dr. Vincent states that a personal care assistant, upon seeing Plaintiff's condition, "reported that it was one of the more severe cases she had seen and ordered more hours be allotted to her" for personal care. [*Id.* at PageID 1763].

Dr. Vincent sent Defendants numerous letters, visit notes, attending physician reports, and filled out multiple forms for Plaintiff. He consistently said that Plaintiff had restrictions, such as, "no prolonged standing, walking, no heavy lifting, must be able to immediately leave work to use bathroom, bedrest frequently, several days per month." [Doc. 17-1, PageID 226]. He indicated in his first attending physician report, that his "diagnostic and clinical findings were muscle tenderness, bilateral; pain with range of motion, multiple joints." [*Id.*]. And, as of November 12, 2015, he thought she was disabled "due to pain fatigue [and] decreased function" from fibromyalgia. [*Id.* at PageID 538]. In February and August 2016, according to Dr. Vincent, Plaintiff could not perform sedentary work and that she had daily muscle pain, fatigue, difficulty concentrating, memory problems, a rheumatoid factor with pain and numbness in hands, sudden and severe diarrhea making it difficult to work in an office, restricted from prolonged standing, walking, no heavy lifting, and could perform low stress work only. [*Id.* at PageID 659, 959–60].

6

On September 14, 2016, Dr. Vincent sent in another attending physician report. [Doc. 17-1, PageID 1027–29]. In this report, he placed different limitations and restrictions on Plaintiff, including no repetitive use of hands, limited use of hands in workplace, no prolonged standing, walking, or sitting, limited bending, and frequent breaks. [*Id.* at PageID 1028]. He listed the dates of restrictions as September 14, 2016, to December 31, 2016. [*Id.*]. Again, on September 15, 2017, Dr. Vincent said that she was not capable of performing sedentary work and encouraged Defendants to see his attached notes. [Doc. 17-2, PageID 1634].

### 2. Lindsey Locken, PA-C

Lindsey Locken became Plaintiff's primary care provider after Dr. Vincent. [Doc. 17-2, PageID 1765]. Her evaluation of Plaintiff was consistent with Dr. Vincent's. In her notes from a visit on November 21, 2017, she reiterated, "Based on our meeting today, I do hesitate to state that she is capable of returning to work given her condition." [*Id.* at PageID 1795]. Further, she noted that Plaintiff received 21 hours of assistance per week to "assist[] with jobs around the house that she can no longer do, drives to appointments, goes to grocery store, etc." [*Id.* at PageID 1794].

### b. Irritable Bowel Syndrome (IBS)

Plaintiff's history with IBS began no later than April 2, 2015. [Doc. 17-1, PageID 525]. On this date, she saw her family physician, Dr. Steven Vincent, who noted, "She has new onset recurrent, significant diarrhea for 6 weeks." [*Id.*]. A few weeks later, on May 21, 2015, Dr. Vincent said that she had "continued irritable bowel which is disabling." [*Id.* at PageID 512]. His notes state that Plaintiff had "alternating diarrhea and constipation. She went twelve days without [bowel movement] while on her trip to Mexico, not responding to laxatives. When she returned home, she suddenly had diarrhea after eating garlic bread, up to 12 stools per day the first two days, preventing her from going to work." [*Id.*].The note continues, saying, "[b]ecause she cannot go

7

very long at work without having sudden abdominal cramps and explosive diarrhea that interrupts her work, she is effectively disabled from her current work situation, working in public with customers, at this time." [*Id.*].

Five days later, on May 26, 2015, Plaintiff visited a gastroenterologist, Dr. Cecil Chally. [Doc. 17-1, PageID 550]. Dr. Chally's notes show slightly different information than Dr. Vincent's. His notes show that Plaintiff did not have a bowel movement for 18 days, and then had bowel movements up to 10 per day on one day and then four or five almost daily thereafter. [*Id.*]. His notes describe medical testing, including an MRI of her head and abdomen, GI endoscopy, colonoscopy, bowel biopsy, gastric biopsies, and blood work. [*Id.*]. Everything was normal except a slight "erythema," which could have been from NSAID use before the endoscopy, and Plaintiff stated that the head MRI had a finding. [*Id.*].She could not recall the finding. [*Id.*].

A few weeks later, after a visit on June 11, 2015, Dr. Vincent said:

Her IBS and recurrent, severe diarrhea have been much worse for the past 4 months. She has been seeing G-I specialist Dr. Chally since 2015, and workup is in progress. Her diarrhea is so severe that she cannot perform her work duties, she needs to urgently use the one bathroom at her place of work, which is not always possible. Her work is at an auto dealership, she is a saleswoman working with the public. She is considering short term, possibly long-term, disability for her G-I condition as it prevents her from working effectively in the work[]place.

[Doc. 17-1, PageID 506]. Plaintiff saw Dr. Vincent again regarding her issues on June 27, 2015. [*Id.* at PageID 503]. His notes indicate, "She has had intractable, incapacitating diarrhea for 3 months, affecting her work. She cannot stay on task at work, interrupted by the diarrhea when she is with clients. There is only one bathroom at her place of work and that is not tenable. She continues to follow with Dr. Chally, G-I." [*Id.*].

As of July 14, 2016, Plaintiff stopped seeing Dr. Chally. [*Id.* at PageID 816]. Plaintiff submitted no other records from a gastroenterologist.

c. Fibromyalgia

Plaintiff was diagnosed with fibromyalgia in 2008. [Doc. 17-2, PageID 1149, 1336]. Over the years, she has tried numerous treatments including lidocaine injections and medication. [*Id.* at PageID 1198–1200]. Rest, heat, cold, lying down, pain medicine, and massages relieve the pain. [*Id.*]. Arter her June 27, 2015, appointment with Dr. Vincent (and after she stopped working), his notes state, "Her FM and fatigue sometimes interfere with work as well" after discussing how IBS affected her work. [Doc. 17-1, PageID 503].

Plaintiff visited Greta Abruzzese RN, CNP, at Rheumatology Nurse Associates from December 2015 to October 2016. [Doc. 17-2, PageID 1147–49]. At an exam on December 10, 2015, with Rheumatology Nurse Associates, she had "14/18" tender points, a measure for fibromyalgia. [*Id.* at PageID 1150]. Plaintiff's fibromyalgia was "exacerbated." [*Id.* at PageID 1150]. The notes say that Plaintiff's "interview was conducted in a dim room with her lying down on the exam table due to her inability to be comfortable sitting in a chair." [*Id.*]. At a visit on August 24, 2016, she was assessed to have, along with fibromyalgia, benign joint hypermobility syndrome, restless legs syndrome, fatigue, mixed anxiety and depression. [*Id.* at PageID 1146]. Her notes state that the fibromyalgia is "inadequately controlled" as of September 22, 2016. [*Id.* at PageID 1147]. She returned a questionnaire on November 18, 2016 to Defendants which said Plaintiff was unable to perform sedentary or light work. [*Id.* at PageID 1144–45]. However, she also noted that any restrictions and limitations should be determined by the FCE from May 2016. [*Id.*]. In November of 2017, Plaintiff reported to Defendants that Rheumatology Nurses told her that there was nothing else that they could do for her and told her to continue seeing Dr. Vincent. [Doc. 17-2, PageID 1686, 1713, 1724].

9

Plaintiff also saw Dr. Jeffrey Wilson, a rheumatologist at Arthritis and Rheumatology Consultants, P.A. [Doc. 17-1, PageID 767]. On January 6, 2016, Dr. Wilson reported "Soft tissue discomfort noted in the anterior neck, posterior neck, left posterior shoulder, right posterior shoulder, right chest, left chest, upper back, low back, right lateral epicondyle, left lateral epicondyle, left posterior thigh, right posterior thigh, right knee, left knee." [*Id.* at PageID 770]. The medical notes also show chills, fatigue, night sweats, weight gain, mouth ulcers, double vision, vision changes, dyspnea, wheezing, depression, insomnia, back pain, joint pain, muscle weakness, and vertigo. [*Id.* at PageID 769–770]. She complained of widespread pain, inability to sleep, and fatigue. [*Id.* at PageID 768. On March 9, 2016, Dr. Wilson sent a form to Defendants stating that Plaintiff had no restrictions. [Doc. 17-1, PageID 702].

Plaintiff also visited Dr. Prasanthi Meagher, a physician with Allana Health Medical Specialties Center. [Doc. 17-1, PageID 749]. In his notes, he says that he agrees with the fibromyalgia diagnoses. [*Id.* at PageID 738]. He also notes that a trigger point was injected with lidocaine and a follow up with pain clinic would be needed. [*Id.*]. She last visited him on March 10, 2016. [*Id.* at PageID 750].

Next, Plaintiff visited CNP Judy Wulf and Dr. Anne Kokayeff at Twin Cities Pain Clinic. The medical notes from September 21, 2016, October 21, 2016, and November 21, 2016, indicate that Plaintiff had fibromyalgia with pain. [Doc. 17-2, PageID 1186, 1192, 1200, 1204–05]. Plaintiff's pain level was reported to be a 7. [*Id.*]. On November 18, 2016, Dr. Kokayeff administered lidocaine into trigger points. [*Id.* at PageID 1198].

On February 22, 2017, Unum sent a letter to Twin Cities Pain Clinic asking if the providers agreed with the FCE, and the letter was returned indicating that Twin Cities Pain Clinic agreed with it. [Doc. 17-2, PageID 1334]. Again, Defendants sent Twin Cities Pain Clinic a letter

requesting a response on November 3, 2017. [*Id.* at PageID 1705]. The response returned to Defendants indicate that Plaintiff could perform a job with these qualities, "Mostly sitting, may involve standing or walking for brief periods of time, lifting, carrying, pushing, pulling 10 Lbs, up to occasionally throughout the day." [*Id.*]. An individual named Cheryl filled out the form as Judy Wulf had left the Pain Clinic. [*Id.* at PageID 1703]. In her appeal, Plaintiff said that Cheryl "had refilled my prescription once but has never examined me. As far as I know, she is not a Doctor, knows little to nothing about me, and really had no business filling out or making recommendations as to what I can or cannot do." [*Id.* at PageID 1746].

   d. Carpal tunnel

   Plaintiff has a history of reporting pain, numbness, and tingling in her hands. Dr. Edward Su evaluated Plaintiff, and the evaluation was consistent with carpal tunnel. [Doc. 17-2, PageID 1570]. Dr. Su performed endoscopic carpal tunnel release on Plaintiff's left hand on June 26, 2017, and on her right hand on July 31, 2017. [*Id.* at PageID 1570, 1638]. He placed restrictions on Plaintiff from June 26, 2017, to July 14, 2017. [*Id.* at PageID 1636]. He added that she could work with no restrictions after July 17, 2017. [*Id.*]. Also, he placed a no-work restriction from July 31, 2017, to August 14, 2017. [*Id.*]. During her recovery, Plaintiff fell. [*Id.* at PageID 1613]. As a result, she reported "increased achy pain in the right palm" to Dr. Su's office. [*Id.*]. She had another treatment, a carpal tunnel injection, on December 8, 2017. [*Id.* at PageID 1776]. The injection reportedly "did not help significantly," and that she had right forearm and hand pain as well as cramping. [*Id.*]. She did not feel any numbness or tingling. [*Id.*]. On August 15, 2017, Defendants sent a letter to Dr. Su asking if Plaintiff whether she could perform full time sedentary work. [*Id.* at PageID 1568]. He said she could. [*Id.*].

Nurse Jenna O'Strand also saw Plaintiff for carpal tunnel. In a note from her office on October 4, 2016, she indicates that Plaintiff has carpal tunnel syndrome, and the only restrictions and limitations are bilateral wrist splints nightly. [Doc. 17-2, PageID 1082–83].

e. Memory loss

On January 21, 2016, Plaintiff visited neurologist Dr. Michael H. Rosenbloom to be evaluated for memory loss. [Doc. 17-1, PageID 681]. He first noted, "The patient is a 46-year-old right-handed woman with a past medical history significant for depression/anxiety and fibromyalgia presenting with one year of memory loss." [*Id.*]. These notes indicate that her memory problems "led to her retiring from her job as a finance manager . . . . " [*Id.*]. Her memory loss issues included forgetting that she had already finished a project and continuing to work on it, forgetting where she was going while driving, forgetting appointments, and forgetting to pay bills. [*Id.*]. She was able to take her medication and grocery shop. [*Id.*]. She also repeated herself, asked the same questions, misplaced objects, and struggled with multitasking, shifting her attention, and maintaining concentration. [*Id.*]. She had trouble following conversations and had to reread passages but otherwise denied word-finding difficulty or reading and writing problems. [*Id.*]. The notes indicate that she has persistent depression and anxiety. [*Id.*]. Further, she felt clumsy and has trouble sleeping through the night. [*Id.*]. She also "ha[d] been experiencing diffuse paresthesias involving the upper and lower extremities. She ha[d] numbness in her back." [*Id.* at PageID 682]. She had a normal MRI. [*Id.* at PageID 684]. The doctor's impression states:

> My impression is that the patient has subjective cognitive decline. Her cognitive symptoms are out of proportion to her neuropsychological testing results. I suspect that a combination of insomnia, depression, and polypharmacy may be contributing to her current symptoms. I doubt that she has a neurodegenerative process such as Alzheimer's disease.

[*Id.*].

She went on to have a psychological evaluation conducted by Dr. Amy Steiner on February 23, March 16, and April 4, 2016. [Doc. 17-1, PageID 918]. The diagnostic impression lists, "Major Depressive Disorder, Recurrent" and "Moderate Unspecified Anxiety Disorder." [*Id.*]. The test showed, "findings indicated intact cognitive functioning with exception of lower than expected (low average range) performance on measures of initial encoding and retrieval of simple verbal information, and visual scanning and processing speed." [*Id.*]. She continued, "This assessor is of the opinion that Ms. Sandeen's condition would interfere markedly with her ability to sustain the necessary concentration, pace and persistence of work activity on a regular and continuing schedule for five days and eight hours a day." [*Id.* at PageID 918].

Dr. Steiner's notes also indicate that the neuropsychological exam was mildly abnormal. [Doc. 17-2, PageID 1057]. There were atypical performance patterns like "recalling information correctly on free-recall but immediately missing the same information on an inherently easier recognition or forced choice format." [*Id.*]. "As such, while non-credible effort is not strongly suspected, performances may be a conservative estimate of her neurocognitive abilities due to the aforementioned variability." [*Id.*]. Plaintiff's "configuration of skills, however, suggests possible over-endorsement of somatic and cognitive symptoms, although not to a level, that necessarily invalidates the inventory, rather the results should be considered with caution as they may over-pathologize her clinical presentation." [*Id.* at PageID 1059].

Dr. Rosenbloom reviewed Dr. Steiner's notes and reiterated that there was "evidence for mild cognitive impairment that would be related to depression, polypharmacy, and insomnia." [Doc. 17-1, PageID 1022–23].

In August 2016, Plaintiff visited Mark Fastner, MA, LP, at Health Partners Regions Behavioral Health. [Doc. 17-2, PageID 1097, 1099]. When visiting Mr. Fastner, Plaintiff stated

13

that she had not been able to do much over the past few weeks because of tiredness and weakness. [*Id.*]. He suggested that she should work with doctors to increase her energy levels, eat three meals a day, and exercise. [*Id.*]. Mr. Fastner noted that Plaintiff says that she has very little to be depressed about; he believed that this demonstrated "her inability to accurately assess her situation" as she is not working, having health issues, and reports that her house is a mess. [*Id.*]. He diagnosed her with major depressive disorder, recurrent episode, moderate. [*Id.*]. In a form that he returned to Unum, he indicated that Plaintiff was retired and on disability, and he didn't set any limitations or restrictions on her. [*Id.* at PageID 1099].

  f. Functional Capacity Examination

   As already mentioned above, Plaintiff received a functional capacity test ("FCE"). On May 17, 2016, Kristin Hallenberg, Occupational Therapist, performed a physical performance test, which the Parties refer to as an FCE, on Plaintiff. [Doc. 17-1, PageID 911]. During the test, Ms. Hallenberg determined that Plaintiff's weight carry capacity was "10 lbs determined by [Plaintiff's] reports of anticipation of increased pain. [Plaintiff] reported 'I'm trying to avoid 2 days of staying in bed.'" [*Id.* at PageID 912]. Plaintiff had a "Stand Up Lift" weight capacity of "10 lbs determined by Decreased lower extremity/trunk endurance and strength and patient reports of onset of dizziness." [*Id.*]. Ms. Hallenberg was unable to measure Plaintiff's capacity for overhead lift as Plaintiff said she would get dizzy and feel faint. [*Id.*]. Plaintiff also reportedly had the capacity to push 39 pounds, pull 29 pounds, and a grip strength of 25 pounds in her left hand and 13 pounds in her right hand. [*Id.* at PageID 912–13]. She was able to climb stairs, sit, and coordinate her upper extremities. [*Id.* at PageID 913]. Her "major limiting factors" were reported pain and fatigue, decrease in quality of motion, slow pace, deconditioning, and demonstration of pain behaviors. [*Id.* at PageID 913]. She had proper body mechanics, but her work efficiency was

limited because of reports of pain and anticipated pain. [*Id.*]. The notes also state that Plaintiff occasionally demonstrated pain behaviors and gave "verbal reports" of pain. [*Id.* at PageID 914]. Before the test began, Plaintiff reported a 7/10 pain rating and a 7.5/10 after the test. [*Id.*]. Plaintiff also called back and reported that she had "excruciating with a pain rating of 9, absolutely horrible. My teeth were clenched, face sweating[;] it was awful. []Yesterday I woke up at 2 a.m. And was sleeping on and off all day. Last night I s1ept from 6 :00 p.m.[to] 2 a.m. The pain was horrible." [*Id.*].

The FCE provided that, "[i]n an 8 hour work day, client can" sit for 5–6 hours in 30–45 minute intervals, stand for 1–2 hours, and walk 1–2 hours at a slow pace and for short distances. [Doc. 17-1, PageID 915]. Of importance, she could occasionally carry 10 lbs and squat lift occasionally 10 pounds. [*Id.* at PageID 916]. She could never lift from waist to overhead with the note that "patient reported inability to lift overhead due to her reports she experiences an onset of dizziness." [*Id.*]. She could perform repetitive motions with her feet and hands, including fine manipulating and simple grasping. [*Id.*]. She was limited on firm grasping. [*Id.*].

g. Claims process

The above medical providers were all Plaintiff's providers. The information below outlines Defendants' claims process and its claim reviewers. The claims process is best explained through a timeline:

- July 24, 2015–Plaintiff files claim, and the claim is assigned to Disability Benefits Specialist ("DBS") Violet Kilgore. [Doc. 17-1, PageID 219].

- August 21, 2015–Plaintiff submits an Attending Physician Statement from Dr. Vincent. [*Id.* at PageID 226].

- November 13, 2015–Kelli Picket performed a vocational review of Plaintiff's occupation after reviewing Plaintiff's job description and after a "detail call" with Plaintiff. [*Id.* at PageID 491]. After reviewing all of the information, Ms. Picket determined "with a reasonable degree of vocational certainty that the insured's occupation in the general economy is most

consistent with Loan Officer Consumer . . . . " [*Id.*]. This occupation is classified as "sedentary." [*Id.* at PageID 492].

- December 16, 2015–After receiving medicals records, Nurse Ruth Brown determined that it remained unclear whether fibromyalgia and IBS precluded work. [*Id.* at PageID 641]. She requested a review from an onsite physician. [*Id.*].

- February 23, 2016–Dr. Tony Smith reviewed the medical documents and determined that Plaintiff could work at the sedentary level, and he recommended a second review by another doctor. [*Id.* at PageID 663–64].

- February 25, 2016–Dr. James Bress reviewed the claim file and concurred with Nurse Brown and Dr. Smith. [*Id.* at 666–68]. DBS Kilgore recommended denying the claim, but Claims Director Jeremy Jackson recommended waiting to make a decision because Plaintiff had more doctors' visits while the claim was pending. [*Id.* at PageID 699]. Plaintiff continued having appointments with various doctors throughout 2016 and submitted documentation of those visits.

- December 29, 2016–Nurse Jackson reviewed new records and recommended that Dr. Smith review the records again and recommended a neuropsychological consult. [Doc. 17-2, PageID 1210–15].

- January 19–20, 2017–Defendants conducted surveillance. [*Id.* at PageID 1263].

- January 24, 2017–Dr. Thomas McLaren reviewed Plaintiff's records and concluded that her behavioral conditions would not prevent her from working in her occupation. [*Id.* at PageID 1281]. He noted that Plaintiff's claim did not include an impairment based on a behavioral condition. [*Id.*].

- February 6, 2017–Dr. Smith, again, reviewed all of the records and concluded that restrictions and limitations provided by Dr. Vincent are unsupported. [*Id.* at PageID 1284].

- February 8, 2017–Dr. Bress reviewed all of the medical documentation again and agreed with Dr. Smith. [*Id.* at 1286–88].

- February 23, 2017–DBS Kilgore recommended denial of the claim, but Director Jackson wanted to wait because Plaintiff said that she had more doctors' appointments. [*Id.* at 1290–91].

- April 28, 2017–DBS Kilgore recommended the denial of the claim, but Director Jackson still wanted more records and to follow up with Dr. Vincent. [*Id.* at PageID 1366–67]

- August 15, 2017–DBS Kilgore sent a letter to Dr. Su after learning about Plaintiff's carpal tunnel surgeries. [*Id.* at PageID 1568–69]

- September 15, 2017–Dr. Vincent responded to Defendants' inquiries and said that Plaintiff cannot perform sedentary work. [*Id.* at PageID 1622–32].

16

- September 29, 2017–Dr. Smith reviewed the file again, with the new information, and determined that Plaintiff could perform sedentary work. [*Id.* at PageID 1652–54].

- October 2, 2017–Dr. Brees reviewed the information and again agreed with Dr. Smith. [*Id.* at PageID 1657–58]

- October 20, 2017–DBS Kilgore recommended that the claim be denied again. [*Id.* at PageID 1670–71].

- October 23, 2017–Unum Quality Compliance Consultant ("QCC") Michael Day disagreed with DBS Kilgore's recommendation. QCC Day recommended asking for current treatment providers and confirming results of FCE. [*Id.* at PageID 1671–73]. He stated that it was unclear whether the results from the FCE were "compatible" with Plaintiff's occupational demands. [*Id.* at PageID 1671]. He recommended a vocational rehabilitation consult to review whether the results of the FCE showed that Plaintiff could perform her occupation. [*Id.*].

- October 25, 2017–Unum removed ROR. A letter to Plaintiff indicates that Defendants are still evaluating her claim. [*Id.* at PageID 1683–1684.].

- November 7, 2017–After receiving more records, DBS Kilgore again recommended denial, and QCC Day agreed. [*Id.* at PageID 1710–11].

- November 9, 2017–Unum notified Plaintiff, via letter, that it denied her claim. [*Id.* at PageID 1715–20]. In a note made on this day, QCC Day explained that he no longer believed a vocational rehabilitation review was necessary because the medical providers from Twin Cities Pain agreed that she could perform sedentary work. [*Id.* at PageID 1713].

- November 13, 2017–Plaintiff appealed. [*Id.* at PageID 1726].

- January 23, 2018–Note created by Christine Galloway showed that Unum received new letters from Dr. Vincent and Ms. Locken. [*Id.* at PageID 1816–17].

- February 7, 2018–Dr. Bartlett reviewed the medical file including new letters from Dr. Vincent and Ms. Locken. He determined that the medical records did not support restrictions that would restrict Plaintiff from working at a sedentary job. [*Id.* at PageID 1816–21].

- February 12, 2018–Unum notified Plaintiff that it upheld its decision to deny her claim.

[*Id.* at PageID 1826–33].

When addressing the appeal denial in her motion, Plaintiff said, "Unum summarized the information they had before the November 9, 2017 denial, and they do not mention the opinion letters submitted by Dr. Vincent and Lindsey Locken." [Doc. 122, PageID 5293]. However, the

letter stated, "On appeal, we completed a thorough independent review of your claim file including the medical information we received from primary care providers, Dr. Vincent, Lindsey Locken, PA-C, and orthopedist, Dr. Su. We also obtained updated office visit notes from Ms. Locken, PA-C." [Doc. 17-2, PageID 1827].

### 1. Dr. Tony Smith

Dr. Smith is a file reviewing doctor for Defendants. [Doc. 17-1, PageID 661]. He is board certified in family medicine. [*Id.* at PageID 664]. During his file review, he tried to contact Dr. Vincent but was unsuccessful. [*Id.* at PageID 655].

He reviewed the file to determine if the current evidence in the file shows that Plaintiff was unable to work in a sedentary job between June 20, 2015, to the date of his review, February 23, 2016. [*Id.* at PageID 661]. Dr. Smith reviewed Dr. Vincent's restrictions, recounted Plaintiff's numerous medical issues, and reviewed clinical data from Dr. Vincent, Dr. Chaly, Ms. Abruzzese, Dr. Hamilton,[1] and Defendants' notes. [*Id.* at PageID 661–62]. He also noted that Plaintiff lives alone, cares for two dogs, grocery shops, prepares food, and performs housework. [*Id.* at PageID 663]. He then determined that the restrictions are not supported and that she could perform sedentary work. [*Id.* at 663–64]. On his second and third reviews, he went over Plaintiff's new medical records and determined that restrictions and limitations were not supported. [*Id.* at PageID 1284, 1652–54].

### 2. Dr. James Bress

After Dr. Smith reviewed the claim, Dr. Bress reviewed it. [Doc. 17-1, PageID 665]. Like Dr. Smith, Dr. Bress is a family physician. [*Id.*]. On his first review, he was asked whether he

---

[1] Based on the administrative record, Dr. Alyse Hamilton is a fibromyalgia specialist. [Doc. 17-1, PageID 536, 465]. Plaintiff only saw her twice, [*Id.* at PageID 484], and Plaintiff does not reference Dr. Hamilton in her motion.

18

agreed with Dr. Vincent or Dr. Smith, and he agreed with Dr. Smith. [*Id.* at PageID 666–67]. Dr. Bress reviewed the whole medical record and incorporated the summarized data into his report. [*Id.*]. He noted that he performed his own analysis and formed his own conclusions. [*Id.*]. He noted that Dr. Vincent restricted her to no prolonged standing or walking, neither of which is required for her job. [*Id.* at PageID 667]. Further, he documented and summarized many of the notes from Plaintiff's medical appointments. [*Id.*]. On his second and third reviews, he again agreed with Dr. Smith's conclusion that her restrictions and limitations for sedentary employment were unsupported. [*Id.* at 1286–88, 1657–58]

### 3. Dr. Thomas McLaren, PhD

Dr. McLaren reviewed the cognitive test performed by Dr. Steiner. [Doc. 17-2, PageID 1280]. After reviewing the cognitive test, Dr. McLaren wrote that the test results "do not provide any support for prior or current psych[ia]tric or cognitive impairment. The cognitive examination is invalid for accurate determination of her cognitive cap[ac]ity due to evidence of suboptimal performance. Similarly, exaggeration of symp[to]ms was found on the personality testing." [*Id.* at PageID 1281]. He said that Plaintiff made no claims of impairment from a behavioral condition. [*Id.*]. He further noted, "I have no disagreement with any provider, thus there are no further recommendations or steps from my area of expertise." [*Id.*]. Dr. McLaren determined that there was no basis for cognitive or psychological impairment. [*Id.*].

### 4. Dr. Chris Bartlett

Plaintiff's appeal was referred to Dr. Bartlett, a family doctor. [Doc. 17-2, PageID 1816, 1821]. He reviewed her file and the claims decision, including new letters from Plaintiff's primary care providers. [*Id.* at PageID 1816–17]. He concluded that no restrictions or limitations were supported that prevented her from performing sedentary work. [*Id.* at PageID 1818]. He gave a

19

thorough analysis of her previous physicians' notes, including that some of her physicians recommended more movement, including hiking and strength training. [*Id.* at PageID 1818–19]. He reviewed her cognitive testing and determined that they did not prevent sedentary work. [*Id.* at PageID 1819–20]. He also reviewed surveillance, but his notes do not indicate whether he watched the video or read a report. [*Id.* at 1820]. His notes say, "Ms. Sandeen was documented driving, shopping in multiple stores, standing, walking, pushing a shopping cart, lifting bags of groceries, and reaching above her head. There was no specific visible evidence of fatigue or pain behavior." [*Id.*]

h. Defendants' Investigation

Defendants investigated Plaintiff. As mentioned in the timeline, Defendants surveilled Plaintiff on two days in January of 2017. This surveillance included video recording of Plaintiff. [Doc. 44]. Defendants had a report and a written summary of the surveillance. [Doc. 17-2, PageID 1263].

The video shows Plaintiff leaving her home to go to two places in a white SUV. [Doc. 44]. One location is non-descript, and Plaintiff is shown leaving with a small bag. [*Id.*]. The other location is a grocery store. [*Id.*]. Plaintiff is seen doing her own shopping with a cart, and then leaving the store with a clerk. [*Id.*]. The clerk helps load her groceries in the back of her SUV, and Plaintiff puts one paper bag in the car herself before reaching up to pull down the hatch of her SUV. [*Id.*].

Defendants have a summary report of the video and surveillance. [Doc. 17-2, PageID 1266]. Plaintiff argues that Defendants subsequently summarized this information incorrectly stating that Plaintiff went to multiple stores when one location was a medical appointment, lifted multiple bags of groceries, and omitted that a store clerk helped her. [Doc. 122, PageID 5303].

20

Defendants also searched Plaintiff's presence online. During the search, they discovered that Plaintiff had been seeking advice in an online forum about how to hang a punching bag and a yoga swing in her home gym. [Doc. 45-1, PageID 3144]. In a later comment to her post, she said that she will build a frame for the punching bag and yoga swing or hire a contractor. [*Id.* at PageID 3148]. Plaintiff does not dispute this internet activity but contends that it is improper to raise it now as Defendants did not use the internet activity as a justification for its decision. [Doc. 137, PageID 6617].

i. Discovery

Generally, discovery beyond the administrative record is not permitted in ERISA cases. An exception to that rule is when an ERISA claimant produces evidence of bias or a procedural irregularity. *Guest-Marcotte v. Life Ins. Co. of N. Am*, 730 F. App'x 292, 304 (6th Cir. 2018) (*quoting Likas v. Life Ins. Co. of N. Am.*, 222 F. App'x. 481, 486 (6th Cir. 2007)).The Court permitted discovery in this case under that exception. [Doc. 92]. Plaintiff's counsel has taken the deposition of Defendant's employees in connection with this case and other cases.

The deposition testimony of Assistant Vice President Marianne Justin indicated that employees who participate in claims decisions, "directors," have access to weekly metrics produced by Defendants' finance department. [Doc. 143, PageID 6826–27]. These metrics, "Weekly Tracking Reports," measure how claims are processed, whether they are "recoveries" or claims terminated for various reasons, including because of a claim decision, death, or exhaustion of benefits, and whether Unum paid the benefits before ultimately denying a claim. [Doc. 144, 34:19–23; 35:10–14; 37:3-4; 39:6-8; 54:16-21]. The Weekly Tracking Reports compare the actual termination of claims with a plan projection. [*Id.* at 18:11–13; 19:10–13; 48:2–4; 49:4– 14]. The Weekly Tracking Reports include a calculation for the expected number of monthly

21

terminations. [*Id.*]. Plaintiff has submitted examples of the Weekly Tracking Reports. [*See, e.g.,* Doc. 147, 147-1].

Plaintiff deposed the director in charge of her claim, Director Jackson. [Doc. 146]. He stated that he is involved in claims decisions and has access to the Weekly Training Reports. [*Id.* at 18–22; 65:17-25; 66:1-7; 79]. As can be seen from the timeline above, he was repeatedly involved in Plaintiff's claim.

Both the Assistant Vice President and the Director deposed by Plaintiff's counsel had termination rates that tracked the planned numbers. [Doc. 144, 89–91; Doc. 146, 90–92]. Defendants insist that the numbers in the Weekly Tracking Reports are not quotas but numbers consistent with historical figures and an inventory of claims. [Doc. 132, PageID 6395; *see, e.g.*, Doc. 147-2]. Defendants also point out that many of the employees who reviewed Plaintiff's claim had no access to financial information, including DBS Kilgore, [Doc. 78-1, PageID 4559], QCC Day, [Doc. 132-3, PageID 6423], Appeals Specialist Bell, [Doc. 132-2, PageID 6420], and the doctors who reviewed her claim, [Doc. 132-1, PageID 6411].

The Court will take this information into consideration in its analysis.

## III. Discussion

After reviewing the Parties' submissions and the administrative record, Defendants' motion for judgment must be granted. Plaintiff has argued that Defendants' claim denial should be reversed for five reasons, each discussed below. Ultimately, none of those arguments show that Defendants' decision was arbitrary or capricious. In fact, the quantity and quality of the evidence used by Defendants in its decision making is robust, and the administrative process itself was thorough and reasonable.

Case 1:18-cv-00248-JRG-CHS   Document 148   Filed 03/30/22   Page 22 of 34   PageID #: 7265

a.  Categorizing Plaintiff's Occupation as "Sedentary"

Plaintiff first argues that Defendants' classification of her occupation as sedentary was not only incorrect but arbitrary and capricious. [Doc. 122 at PageID 5296]. As previously discussed, Plaintiff worked at Buerkle Motor Company Inc. as a "Finance & Insurance Manager." [*Id.* at PageID 242–43]. According to Plaintiff, her job is not "sedentary" based on the job description, which calls for lifting up to 20 lbs, pushing and pulling up to 25 lbs, and bending. [*Id.* at PageID 5296–97].

Plaintiff's benefits determination does not rely exclusively on her last job, it takes into account her "occupation." The Sixth Circuit has ruled the term "occupation" is broad enough that an administrator can seek information regarding "categories of work" rather than a specific job or position. *Osborne v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006). Both Plaintiff and Defendants have looked at categories of Plaintiff's occupation, but they looked at different categories.

Plaintiff posits that her job is similar to "Sales Representative, Automotive-Leasing, as defined in the Department of Labor's Dictionary of Occupational Titles (DOT# 273.357-014)." Doc. 122, PageID 5297]. This description is not in the administrative record, but Plaintiff attached it as an exhibit to her motion. [Doc. 122, PageID 5297; Doc. 122–2, PageID 5321–22]. It says:

> SALES REPRESENTATIVE, AUTOMOTIVE-LEASING
> (business ser.)
> Sells automotive-leasing services to businesses and individuals: Visits prospective customers to stimulate interest in establishing or expanding automotive-leasing programs. Explains advantages of leasing automotive equipment, such as tax savings and reduced capital expenditures. Recommends types and number of vehicles needed to satisfactorily perform job with minimal expense. Computes leasing charges. based on such factors as length of contract, anticipated mileage, and applicable taxes. Prepares and sends leasing contract to leasing agency. Performs other tasks to increase sales, such as evaluating advertising campaigns or revising administrative procedures. Performs other duties as described under SALES REPRESENTATIVE (retail trade; wholesale tr.)"

23

[Doc. 122-2, PageID 5321–22]. The occupation is considered light work. [*Id.*]. Plaintiff relies entirely on her job description in finding this job category. [Doc. 122, PageID 5298].

Defendants, however, searched an occupation database referred to as "eDOT." [Doc. 17-1, PageID 491]. Based on the job description and a "detail call" with Plaintiff, Defendants identified a Loan Officer Consumer as the most similar occupation. [*Id.*]. This occupation, according to eDOT, "Interviews applicants and studies, evaluates, and authorizes or recommends approval of customer applications for consumer loans, including vehicle loans, home improvement, home equity, personal, secured and unsecured, student loans, credit cards, etc." [*Id.* at PageID 491–93]. This occupation is performed at the sedentary level. [*Id.* at PageID 492]. A sedentary occupation requires, among other things, someone to lift up to 10 pounds occasionally. [*Id.*].

Plaintiff argues that the decision to define her work as sedentary was arbitrary and capricious. [Doc. 122, PageID 5298]. Defendants disagree. Defendants say that they have broad discretion to determine Plaintiff's "own occupation" under the plan, and their conclusion that her occupation was sedentary is reasonable. [Doc. 133, PageID 6430–31].

Plaintiff compares Defendants' decision to that of Unum Life Insurance Company of America in *Gilchrest v. Unum*. In *Gilchrest*, the benefits administrator used a job description provided by a company to select a "regular occupation." *Gilchrest v. Unum Life Ins. Co. of Am.*, 255 F. App'x 38, 42 (6th Cir. 2007). This was a significant error because the undisputed evidence showed that the job description was wrong. *Id.* The insured's job title was "Assistant Site Manager," but "the material and substantial duties of his job were to drive to and from military bases, sign for and inventory surplus items, move the inventory on and off pallets by hand, and move pallets on and off trucks with a forklift." *Id.* at 41–43. The administrator recognized that the

24

plaintiff had to do "lots of walking, driving a forklift, loading trucks, and lifting up to 80 lbs. without assistance." *Id.* at 42. Even knowing this information, the administrator said that his occupation required only light work. *Id.* at 42. This designation was arbitrary and capricious because his occupation and job duties were not covered by the occupation and category chosen by the administrator. *Id.*

Defendants' decision here is not arbitrary or capricious. Even though Defendants chose an occupation that was less demanding than the company's job description, Plaintiff has not explained how that job description is incorrect. Unlike in *Gilchrest*, nothing in the record shows that Plaintiff had to lift, bend on a regular basis, or lift any amount of weight. And yet, the Parties disagree about her occupation.

While Plaintiff may disagree with Defendants' occupation classification, it had a reasonable basis, the job description, a phone call with Plaintiff, and an eDOTs occupation search. Plaintiff has pointed out how the eDOTs occupation classification conflicts with Buerkle's job description but has not shown the eDOTs occupation conflicts with her actual job duties or her actual occupation. The Sixth Circuit has said, "[R]easonable persons may disagree over the most appropriate methodology for determining a particular employee's 'occupation' . . . ." *Osborne v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296, 299–300 (6th Cir. 2006) (citing *Gallagher v. Reliance Std. Life Ins. Co.*, 305 F.3d 264, 272 (4th Cir.2002)). Defendants' decision was not arbitrary and capricious and was reasonable based on the evidence in the administrative record.

b. Conflict of Interest

Plaintiff filed a separate motion for determining discretion. [Doc. 142]. The motion addresses one factor that the Court must evaluate when deciding the Parties' motions for judgment. Therefore, the Court will consider this motion a supplement to her motion for judgment.

Plaintiff argues that "because of the pervasive nature of Unum's practice of allowing its conflict of interest to infect its decision-making process, the Court should afford Unum's decision little, if any, deference in its review of Ms. Sandeen's claim." [Doc. 143, PageID 6824]. Plaintiff points to Unum's history of using "quotas for its disability claims teams and communicat[ing] those goals along with the approximate value in reserves for individual claims to the claims handling personnel." [*Id.* at PageID 6825]. Plaintiff argues that Unum never corrected these wrongs after state regulators penalized it. [*Id.* at PageID 6825–26]. According to Plaintiff, Unum continues to use financial metrics in the claims department, and the financial department influences Unum's claims decision. [*Id.* at PageID 6825–26].

Defendants argue that safeguards exist to prevent any form of bias. Defendants argue that "benefits decisions are based on a thorough review of the claim, which in this case included the review of over 1700 pages of medical and other information including the reviews by four board-certified physicians, a nurse clinician, a vocational consultant, a DBS, a Quality Compliance Consultant, and an Appeals Specialist. None of these individuals were privy to the metric data that Plaintiff asserts tainted Paul Revere's claim decision." [Doc. 132, PageID 6392]. According to Defendants, Plaintiff has not shown how the conflict of interest impacted the claims decision. [*Id.*].

The nature of the insurance business sometimes creates conflicts of interest. A conflict of interest exists when an administrator is also the insurer, that is, "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). When an administrator is operating under a conflict of interest and has discretion under the benefit plan, "that conflict must be weighed as a 'factor in determining

whether there is an abuse of discretion.'" *Id.* at 111 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

The Supreme Court has given guidance about how to take a conflict of interest into account. The arbitrary and capricious standard of review does not change. *Metro. Life Ins. Co.*, 554 U.S. at 115. Instead, "when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one." *Id.* at 117. When evaluating a claim decision "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.* at 117–18. A conflict of interest is "more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Id*. The conflict is "less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.* The ultimate concern of this inquiry is to evaluate whether there is bias. *Id.*

The Court does not take lightly the potential problems that having anyone in the benefits department knowing financial goals could create. An administrator should not make individual benefits decisions based on projections. That said, the record in this case shows that Defendants' employees were extremely thorough. Most of the employees that evaluated the claim did not know about the tracking reports. These employees requested documents from Plaintiff's doctors

repeatedly, and Director Jackson, who had access to the reports, made decisions beneficial to Plaintiff. The claim took years to process, all while paying benefits under a reservation of rights.

The discovery information showed that there is a conflict of interest in the decision-making process of Defendants. Nothing in this case indicates that this conflict of interest heavily influenced the decision to deny her claim. While the Court acknowledges that the conflict of interest is a factor to be considered while reviewing Defendants' decision, the conflict of interest, in all likelihood, did not affect this decision. The Court has considered the conflict of interest, but it is not outcome determinative.

c. Conflicting Medical Opinions

Next, according to Plaintiff, "Unum's decision remains arbitrary and capricious as it depended on file reviewing physicians to discredit the opinions of Ms. Sandeen's actual treating providers." [Doc. 122, PageID 5299]. Plaintiff highlights that Defendants could have requested an independent medical exam. [*Id.* at PageID 5300].

Plaintiff specifically took aim at one of Defendants' doctors, Dr. Bress. Dr. Bress's report was criticized in another case for not giving a reasoned explanation and was not sufficient to deny a claim. *Holler v. Hartford Life & Acc. Ins. Co.*, 737 F. Supp. 2d 883, 892 (S.D. Ohio 2010), *opinion clarified on denial of reconsideration* (Nov. 22, 2010). Further, the record in that case mischaracterized evidence. *Id.*

In this case, Dr. Bress gave a thorough reasoning for his conclusions. He looked at the medical record at least three times, and he was asked whether he agreed with Dr. Smith. Each time, he made his own conclusions and performed his own analysis. Further, Dr. Bress's opinion was in agreement with many of Plaintiff's own medical providers.

28

Plaintiff further criticizes Defendants' decision for relying on file reviewing doctors over treating physicians, in this case and more broadly. Precedent is instructive on how much weight a doctor's opinion will receive based on the doctor's role in the claim evaluation. In general, one medical doctor's opinion is not more valid than another's. *See Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.*, 419 F.3d 501, 510 (6th Cir. 2005). A treating physician's opinion does not receive any special treatment, and there is no "heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id.* at 508 (quoting *Black & Decker Disability Plan*, 538 U.S. 822, 831 (2003)). Some "treating physicians may have strong pro-claimant biases." *Creech v. UNUM Life Ins. Co. of N. Am.*, 162 F. App'x 445, 457 (6th Cir. 2006) (quoting *Eastover Mining Co. v. Williams*, 338 F.3d 501, 510 (6th Cir.2003).

On the other hand, according to the Sixth Circuit, "when a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." *Id.* at 507 (quoting *Moon v. Unum Provident Corp.,* 405 F.3d 373, 381–82 (6th Cir. 2005)). Similarly, "[w]hether a doctor has physically examined the claimant is indeed one factor that . . . may [be] consider[ed] . . . . " *Id.* at 508; *see Calvert,* 409 F.3d 286, 295 (6th Cir. 2005) ("[W]e find that the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."). Yet "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly." *Id.*" *Kalish*, 419 F.3d at 508; *see Holt v. Life Ins. Co. of N. Am.*, No. 1:13–CV–339, 2015 WL 1243529, at *5 (E.D. Tenn. Mar. 18, 2015).

Even if Defendants overly rely on their file reviewing doctors in other cases, nothing in this case indicates that relying on file reviewing doctors on Plaintiff's claim was improper. A fatal flaw to Plaintiff's argument is that Defendants' decision and file reviewers did not contradict all

29

of her medical providers. Two of her medical providers, Dr. Vincent and Ms. Locken consistently opined that she was disabled. Similarly, Dr. Steiner, when discussing memory loss, said that Plaintiff's condition would interfere with her work. However, her other physicians and medical providers did not place restrictions on her ability to perform her occupation. The file-reviewing doctors agreed with most of Plaintiff's treating physicians and the FCE, and the file-reviewing doctors gave thorough explanations why they thought Plaintiff's conditions did not prevent her from working. Many of her medical providers, except the three mentioned, and Defendants' file reviewers came to the same set of conclusions, that Plaintiff could perform sedentary work.

If the Court were to follow Plaintiff's argument and accept the minority view of Plaintiff's ability to work, it would be running afoul of other Sixth Circuit precedent prohibiting the special treatment of some physicians' opinions.

### d. Mischaracterizing evidence

Plaintiff points to three pieces of allegedly mischaracterized evidence to argue that Defendants' decision was arbitrary and capricious.

#### 1. Form filled out by non-treating physician

Plaintiff argues that Defendants' decision was arbitrary and capricious because it relied on a form filled out by a non-treating medical provider. Twin Cities PC sent a form to Defendants on November 7, 2017. [Doc. 17-2, PageID 1704]. This form indicated that Plaintiff could perform sedentary work. [*Id.* at PageID 1705]. Based on conversations between Twin Cities PC and Defendants, the form was not filled out by Plaintiff's provider, Judy Wulf, and was filled out by someone named "Cheryl." [*Id.* at PageID 1703]. Defendant denied the claim after receiving the form. In her appeal, Plaintiff stated that as far as she knew, "Cheryl" never treated her. [*Id.* at PageID 1746]. Plaintiff argues that it was improper to take this into consideration because

Defendants knew Plaintiff's provider didn't fill it out. Plaintiff does not say who should have filled out the form at Twin Cities PC since Ms. Wulf no longer worked there.

Plaintiff's argument does not carry much weight. Even omitting the last form from consideration, Ms. Wulf's last correspondence stated that she agreed with the FCE, [Doc. 17-2, PageID 1334], which stated that Plaintiff could perform fine manipulation, sit for six hours per day, stand for two hours per day, walk for two hours per day, and lift up to ten pounds, [Doc. 17-1, PageID 911–12]. As discussed below, the FCE is consistent with sedentary work. Therefore, Defendants' decision would not be arbitrary and capricious if they had relied on the FCE results and the form completed by Ms. Wulf as opposed to the letter from Cheryl.

### 2. Misconstruing FCE

Next, Plaintiff challenges Defendants' reading of the FCE. Plaintiff argues that her FCE test results "restricted [her] to between 5-6 hours per day with breaks every 30 to 45 minutes and standing of between 1-2 hours per day." [Doc. 122, PageID 5303]. And that sedentary level requires an eight-hour workday with six hours seated. [*Id.*]. Also, Plaintiff cites her slow pace, limited endurance and ability to complete tasks. [*Id.*]. Last, Plaintiff notes that at least one employee of Defendants, QCC Day, questioned whether the FCE supported sedentary work. [*Id.*]

In response, Defendants point to the FCE findings on Plaintiff's strength and mobility and argue that the FCE was properly construed. [Doc. 133, PageID 6442].

Defendants were not arbitrary and capricious in construing the FCE as supporting their decision. The FCE states that, in an 8–hour workday, she can sit up to 6 hours per day, stand for up to 2 hours a day, and walk for up to 2 hours a day. She could also lift up to ten pounds and manipulate objects. While breaks are required under the FCE, it is not readily apparent to the Court that breaks from sitting interfere with a sedentary occupation.

### 3. Surveillance and inaccurate summary

Plaintiff also faults Defendants' surveillance summary. [Doc. 122, PageID 5303–04]. Defendants summarized the surveillance as "Ms. Sandeen was documented driving, shopping in multiple stores, standing, walking, pushing a shopping cart, lifting bags of groceries, and reaching above her head. There was no specific visible evidence of fatigue or pain behavior." [Doc. 17-2, PageID 1820]. Plaintiff states that Defendants' report is misleading because she went to a doctor's appointment and a grocery store instead of "multiple stores." [Doc. 122, PageID 5303–04]. Similarly, Defendants' report stated that she lifted grocery bags, plural, while she only lifted one. [*Id.*]. Further, the summary does not mention that a clerk helped her out to her SUV. [*Id.*]. Plaintiff contends that the administrative file does not indicate whether file reviewing doctors watched the video or read the summary. [*Id.*].

Defendant responds that the mischaracterization does not warrant reversal. [Doc. 133, PageID 6443]. Defendant focuses on the fact that "the Plaintiff, who lives alone and cares for two dogs, was and is able to care for herself and, apparently, run errands and grocery shop as needed, not to mention apparently being able to install a punching bag in her basement gym." [*Id.*].

While the summary may not be completely accurate, its inaccuracies do not warrant a reversal of Defendants' claim decision. The summary is a fair representation of the video recording submitted to the Court, except one of the stores was a doctor's office and Plaintiff lifted one bag, not multiple. The Court cannot agree that a use of this summary is misleading and that Defendants' decision based, in part, on the surveillance was arbitrary and capricious.

### e. Paying benefits and then reversing

Plaintiff's last argument focuses on the removal of the reservation of rights before denying Plaintiff's claim. Plaintiff views the removal of the reservation of rights as equivalent to

32

Defendants' granting her claim, thereby the eventual denial should be a reversal of a benefits grant. [Doc. 122, PageID 5304–05]. According to Plaintiff, Defendants' handbook only permits a lifting of a reservation of rights if "liability becomes reasonably clear." [*Id.* at PageID 5289]. To Plaintiff, and citing to the Eighth and Eleventh Circuits, this means that Defendants must show evidence that Plaintiff was no longer disabled before terminating her benefits. [Doc. 122, PageID 5304–05].

Plaintiff's argument is undercut by the letter sent to her by Defendants regarding the reservation of rights. In the October 25, 2017 letter, Defendants clearly state, "[W]hile we continue the evaluation of your eligibility for ongoing benefits under the terms of the policy we have removed the Reservation of Rights that was applicable to prior payments for your Long Term Disability claim." [Doc. 17-2, PageID 1683]. The letter also states, "We are continuing to evaluate your claim to determine if you meet the policy definition of disability." [*Id.*].

Defendants did not grant Plaintiff's claim and then arbitrarily and capriciously deny it. The record in this case shows an extensive claims process that reached an ultimate decision rather than a decision that was granted and reversed. Because Defendants never granted and then terminated her benefits, the authority cited by Plaintiff is inapplicable.

   f.  Conclusion

Defendants' claim decision was reasonable and supported by the record. Even considering the conflict-of-interest, Plaintiff has failed to show that Defendants' decision was arbitrary and capricious. Based on the record, Defendants' administrative process on this claim was thorough, lasted years, and was often repetitive. Defendants made a reasonable decision based on the quantity and quality of evidence in the record when denying Plaintiff's claim.

## IV.    Conclusion

For the reasons stated above, Plaintiff's Motion to Determine Extent of Deference Given to Unum's Decision, [Doc. 142], will be construed as a supplement to her Motion for Judgment, and her motion for judgment, [Doc. 121], is DENIED. Defendants' motion for judgment, [Doc. 119], is GRANTED. Plaintiff Sandeen's complaint is DISMISSED.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
